IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| INTERNATIONAL OLYMPIC COMMITTEE and UNITED STATES OLYMPIC COMMITTEE, | ) ) ) | |
| | ) | Case No.:    4:15-cv-03277 |
| Plaintiffs, | ) ) | |
| | ) | Honorable Keith P. Ellison |
| v. | ) ) | |
| STEPHEN P. FRAYNE JR. and CITYPURE L.L.C., | ) ) | **JURY DEMANDED** |
| | ) | |
| Defendants. | ) ) | |
| ——————————————————— | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

Table of Authorities ................................................................................................ii

I.    Nature and Stage of Proceeding..............................................................1

II.   Statement of the Issues.............................................................................1

III.  Standard of Review..................................................................................2

IV.   Argument ..................................................................................................4
      A.    Plaintiffs' Allegations are Stated With Particularity ....................4
      B.    The Court Has Subject Matter Jurisdiction..................................8
      C.    The Complaint States a Claim Under the ACPA.........................17
      D.    Defendants' Additional "Facts" Do Not Support Dismissal of the .............
      Complaint....................................................................................22

V.    Conclusion.................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Accord Champion Cooler Corp. v. Dial Mfg.,*
   3:09-cv-1498, 2010 WL 1644193 (N.D. Tex. Apr. 22, 2010) ............................................ 4

*Alpha Kappa Alpha Sorority Inc. v. Converse Inc.,*
   175 Fed. Appx. 672, 80 U.S.P.Q.2d 1448 (5th Cir. 2006)................................ 18, 19, 21, 22

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)........................................................................................................ 3

*Athens 2004 Organizing Comm. v. Molloy,*
   FA 260584 (Nat. Arb. Forum June 11, 20014)................................................................ 18

*Barrera–Montenegro v. United States,*
   74 F.3d 657 (5th Cir. 1996) ............................................................................................ 2

*Beijing Organizing Comm. v. GBS Data Sys.,*
   FA 479544 (Nat. Arb. Forum June 28, 2005)............................................................ 2, 18

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)........................................................................................................ 3

*Bosley Med. Inst., Inc. v. Kremer,*
   403 F.3d 672 (9th Cir. 2005) ......................................................................................... 16

*Canales v. ALM Media, LLC,*
   12-cv-1036, 2013 WL 5719476 (W.D. Tex. Oct. 18, 2013)............................................. 21

*Caterpillar, Inc. v. Williams,*
   482 U.S. 386 (1987) ........................................................................................................ 9

*Coca-Cola Co. v. Purdy,*
   382 F.3d 774 (8th Cir. 2004) ......................................................................................... 15

*Compana, LLC v. Mondial Assistance, SAS,*
   No. 3:07-cv-1293, 2008 WL 190552 (N.D. Tex. Jan. 23, 2008)........................................ 6

*Cottonwood Fin. Ltd. v. Cash Store Fin. Servs.,*
   778 F. Supp. 2d 726 (N.D. Tex. 2011) ........................................................................... 11

*DaimlerChrysler v. The Net Inc.,*
   388 F.3d 201 (6th Cir. 2004) ......................................................................................... 17

*David Yurman Enters., LLC v. Sam's East, Inc.*,
   114 USPQ2d 1723, 2015 WL 1602136 (S.D. Tex. Apr. 9, 2015) ................................................ 4

*E. & J. Gallo Winery v. Spider Webs Ltd.*,
   129 F. Supp. 2d 1033, (S.D. Tex. 2001) ............................................................................. 16

*Euromarket Designs, Inc. v. Crate & Barrell Ltd.*,
   96 F. Supp. 2d 824 (N.D. Ill. 2000) ................................................................................. 12

*Exxon Mobil Corp. v. FX Networks, LLC*,
   39 F. Supp. 3d 868 (S.D. Tex. 2014) ................................................................................. 4

*Farouk Sys., Inc. v. Costco Wholesale Corp.*,
   700 F. Supp. 2d 780 (S.D. Tex. 2010) ................................................................................ 4

*Frayne v. Chicago 2016*,
   1:08-cv-05290 (N.D. Ill., filed Sept. 17, 2008, terminated Nov. 10, 2009) ...................... 6, 7, 8

*Full Sail, Inc. v. Dauben, Inc.*,
   Civil Action No. 3:08-CV-0446-G, 2008 WL 2434313 (N.D. Tex. June 17, 2008) ............... 23

*Greater Houston Transp. Co. v. Uber Tech., Inc.*,
   4:14-0941, 2015 WL 1034254 (S.D. Tex. March 10, 2015) ..................................................... 3

*Hearts on Fire Co., LLC v. Blue Nile, Inc.*,
   603 F. Supp. 2d 274 (D. Mass. 2009) ............................................................................ 2, 11

*Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.*,
   143 F.3d 1006 (5th Cir. 1998) ......................................................................................... 2

*Hysitron, Inc. v. MTS Sys.Corp.*,
   No. 07–01533, 2008 WL 3161969 (D. Minn. Aug. 1, 2008) .............................................. 2, 11

*Int'l Olympic Comm. v. The Vu Dao/Home*,
   FA 1589324 (Nat. Arb. Forum Dec. 24, 2014) ...................................................................... 18

*Jews for Jesus v. Brodsky*,
   993 F. Supp. 282 (D. N.J. 1998) ...................................................................................... 14

*John Crane Prod. Solutions, Inc. v. R2R and D, LLC*,
   3:11-cv-3237, 2012 WL 1571080 (N.D. Tex. May 4, 2012) .................................................. 21

*Leis & Sartash, Inc. v. Davidson*,
   955 F. Supp. 2d 821 (N.D. Ill. 2013) ................................................................................ 11

*Lormand v. U.S. Unwired, Inc.,*
    565 F.3d 228 (5th Cir. 2009) ................................................................ 3

*Lucas Nursery and Landscaping, Inc. v. Grosse,*
    359 F.3d 806 (6th Cir. 2004) .............................................................. 16

*Maritz , Inc. v. Cybergold, Inc.,*
    947 F. Supp. 1328 (E.D. Mo. 1996)..................................................... 12

*Patterson v. Weinberger,*
    644 F.2d 521 (5th Cir. 1981) ................................................................ 9

*Randall D. Wolcott, M.D., P.A. v. Sebelius,*
    635 F.3d 757 (5th Cir. 2011) ................................................................ 3

*Registral.com, LLC v. Fisher Controls Int'l, Inc.,*
    2001 WL 34109376 (S.D. Tex. June 28, 2001) ............................... 13, 16

*Rescuecom Corp. v. Google, Inc.,*
    562 F.3d 123 (2d Cir. 2009).............................................................. 11

*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.,*
    483 U.S. 522 (1997).......................................................................... 22

*Severance v. Patterson,*
    566 F.3d 490 (5th Cir. 2009) .............................................................. 10

*Tempur-Pedic Int'l. Inc. v. Angel Beds LLC,*
    902 F. Supp. 2d 958 (S.D. Tex. 2012) ................................................ 21

*Texas Int'l Property Ass'n v. Hoerbiger Holding AG,*
    624 F. Supp. 2d 582 (N.D. Tex. 2009) ................................................ 23

*Transamerica Corp. v. Moniker Online Servs., LLC,*
    672 F. Supp. 2d 1353 (S.D. Fla. 2009) ............................................. 2, 11

*U.S. Olympic Comm., Int'l Olympic Comm., and Salt Lake Org. Comm. for the Olympic Winter Games of 2002 v. 2000olympic.com, et al.,*
    1:00-CV-01018-CMH (E.D. Va., filed June 20, 2000) ......................... 20

*United Servs. Auto. Ass'n v. Mitek Sys., Inc.,*
    2013 WL 652420 (W.D. Tex. Feb. 15, 2013)........................................ 4

*Vulcan Golf, LLC v. Google Inc.,*
    552 F. Supp. 2d 752 (N.D. Ill. 2008) ................................................ 2, 11

*Web-Adviso v. Trump,*
    927 F. Supp. 2d 32 (E.D. N.Y. 2013) ................................................ 8, 13, 14, 15, 16

*Wellpath Solutions, Inc. v. Wellpath Energy Servs., LLC,*
    2013 WL 1314423 (E.D. Tex. Mar. 28, 2013) ........................................................ 4

*Wilens v. Doe Defendant No. 1,*
    2015 WL 4606238 (N.D. Cal. July 31, 2015)........................................................ 16

*Williamson County Reg'l Planning Comm'n v. Hamilton Bank,*
    473 U.S. 172 (1985)............................................................................................ 10

## Statutes

15 U.S.C. § 1114(1) ............................................................................................ 1
15 U.S.C. § 1125 .................................................................................... 1, 16, 17
28 U.S.C. § 1331 ............................................................................................ 2, 9
28 U.S.C. 1367................................................................................................... 9
36 U.S. § 220506 .................................................................... 1, 4, 17, 20, 21, 22
36 U.S.C. § 371 *et seq.*........................................................................................ 1

## Rules

Fed. R. Civ. P. 12.......................................................................................... 2, 3

## Other

Section 16.105 of the Texas Business and Commercial Code....................... 1, 9, 20, 21

Defendants' motion to dismiss is frivolous and should be denied for the reasons stated below.

## I.     Nature and Stage of Proceeding

This is an action for violation of the Ted Stevens Olympic and Amateur Sports Act ("OASA"), 36 U.S.C. § 371 *et seq.*; the Anticybersquatting Consumer Protection Act ("ACPA"), codified at Section 43(d) of the Federal Trademark Act of 1946, as amended (the "Lanham Act"), 15 U.S.C. § 1125(d); federal unfair competition and false designation of origin in violation of Lanham Act Section 43(a), 15 U.S.C. §1125(a); federal trademark infringement under Lanham Act Section 32(1), 15 U.S.C. § 1114(1); and Section 16.105 of the Texas Business and Commercial Code, Tex. Bus. & Com. Code § 16.105.  Defendants have moved to dismiss the complaint for failure of subject matter jurisdiction and failure to state a claim under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## II.    Statement of the Issues

Defendants' motion to dismiss raises the following three issues, in their words:

(1)     Whether Plaintiffs' Complaint is ripe so as to allow this Court to exercise subject matter jurisdiction over Defendants despite the fact Defendants have not made any use of Plaintiffs' alleged Olympic City/Year mark in commerce or trade;

(2)     Whether Plaintiffs' cybersquatting claim under the ACPA fails as a matter of law where Plaintiffs did not possess a protactable mark at the time of Defendants' domain name registrations, including tokyo2020.com; and

(3)     Whether Plaintiffs' cybersquatting claim under the ACPA fails as a matter of law where Defendants' domain name registrations do not incorporate a mark protected by Section 220506 of Title 36 and the Texas counterpart statute.

Defendants' Memorandum in Support of Motion to Dismiss, p. 1 (Dkt. # 24).

1

As discussed below, the first issue raised by Defendants is in conflict with every court to consider the issue.[1] The second issue disputes the factual allegation in the Complaint that Plaintiffs *did* possess a protectable family of marks at the time of Defendants' domain name registrations, even the one allegedly registered in 2002,[2] based on Plaintiffs' continuous, extensive and exclusive use of such marks since 1896. The third issue is moot because Plaintiffs' ACPA claim does not require a violation of the OASA or its Texas counterpart, and in any event, the complaint sufficiently alleges a violation of that statute.

## III.    Standard of Review

Federal question jurisdiction exists with respect to "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (2006). Rule 12(b)(1) of the Federal Rule of Civil Procedure authorizes a court to dismiss a plaintiff's complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.,* 143 F.3d 1006, 1010 (5th Cir. 1998). Lack of subject matter jurisdiction may be found on three bases: (1) the complaint; (2) the complaint supplemented by undisputed facts supplied in the record; or (3) the complaint supplemented by undisputed facts and the court's resolution of

---

[1]      *See, e.g., Transamerica Corp. v. Moniker Online Servs., LLC,* 672 F. Supp. 2d 1353, 1361–62 (S.D. Fla. 2009) (holding that monetization of trademark in pay-per-click advertising constitutes use in commerce); *Vulcan Golf, LLC v. Google Inc.,* 552 F. Supp. 2d 752, 760 (N.D. Ill. 2008); *Hearts on Fire Co., LLC v. Blue Nile, Inc.,* 603 F. Supp. 2d 274, 282 (D. Mass. 2009); *Hysitron, Inc. v. MTS Sys. Corp.,* No. 07–01533, 2008 WL 3161969 (D. Minn. Aug. 1, 2008).

[2]      Due to the lack of transparency in domain name registration, Plaintiffs demand strict proof that Defendants' alleged chain of title goes back to 2002 in the single domain name in question. It is a false issue, however, because the present case involves over 1,459 disputed domain names and a course of willful conduct based on the monetization of Plaintiffs' trademarks. This contest bears little resemblance to the image of "David and Goliath" proposed by Defendants.

disputed facts. *Barrera–Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir. 1996). At this stage in the proceeding, only one of the first two bases would apply because at the motion to dismiss stage, courts must assume the veracity of the facts alleged in a complaint. *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009).

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a complaint to be dismissed for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570).[3] When ruling on a 12(b)(6) motion, the Court may consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Randall D. Wolcott, M.D., P.A. v. Sebelius,* 635 F.3d 757, 763 (5th Cir. 2011) (internal citations and quotations omitted). The Court assumes all well-pleaded facts contained in the complaint are true. *Id.* Even under the liberal standards of *Iqbal* and *Twombly,* however, "motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted); *Greater*

---

[3]      In *Iqbal,* the Supreme Court reaffirmed *Twombly's* "two-pronged approach" to determine whether a complaint states a plausible claim for relief. *Iqbal,* 556 U.S. at 663. First, courts must identify those pleadings that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Second, upon identifying the well-pleaded factual allegations, courts must "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

*Houston Transp. Co. v. Uber Tech., Inc.,* 4:14-0941, 2015 WL 1034254, at *5, (S.D. Tex. March 10, 2015).[4]

## IV.  Argument

Plaintiffs' allegations are stated with particularity, and Defendants' legal arguments are frivolous because:

(1)    The 2008 covenant not to sue cited in Defendants' motion is limited to a single domain name;

(2)    Plaintiffs' ACPA claim does not require Plaintiffs to allege a "use in commerce";

(3)    Even if Plaintiffs were required to allege a use in commerce under the ACPA, the complaint alleges that Defendants are engaged in the monetization of Plaintiffs' trademarks, a use in commerce;

(4)    Plaintiffs are not required to show that Defendants attempted to sell the disputed domain names to Plaintiffs;

(5)    Plaintiffs are not required to show that the content at Defendants' websites falsely represents an association with or authorization by Plaintiffs;

(6)    The complaint sufficiently alleges that Plaintiffs possessed a protectable family of marks at the time of Defendants' domain name registrations based on Plaintiffs' extensive, continuous and exclusive use of such marks since 1896; and

(7)    Plaintiffs' ACPA claim does not require a finding that Defendants' domain name registrations incorporate a mark protected by the OASA, 36 U.S.C. § 220506, and even if it did, the complaint sufficiently alleges that Plaintiffs' family of City/Year marks is protected by the OASA.

## A.    Plaintiffs' Allegations are Stated With Particularity.

The complaint alleges that Plaintiffs own exclusive rights in trademarks consisting of a city name followed by an even-numbered year corresponding to years in which the Olympic

---

[4]      *Accord Champion Cooler Corp. v. Dial Mfg.*, 3:09-cv-1498, 2010 WL 1644193 (N.D. Tex. Apr. 22, 2010); *David Yurman Enters., LLC v. Sam's East, Inc.,* 114 USPQ2d 1723, 2015 WL 1602136 (S.D. Tex. Apr. 9, 2015); *Exxon Mobil Corp. v. FX Networks, LLC,* 39 F. Supp. 3d 868 (S.D. Tex. 2014); *Farouk Sys., Inc. v. Costco Wholesale Corp.,* 700 F. Supp. 2d 780 (S.D. Tex. 2010); *United Servs. Auto. Ass'n v. Mitek Sys., Inc.,* 12-cv-282, 2013 WL 652420 (W.D. Tex. Feb. 15, 2013); *Wellpath Solutions, Inc. v. Wellpath Energy Servs., LLC,* 6:12-cv-286, 2013 WL 1314423 (E.D. Tex. Mar. 28, 2013).

Games are held, *e.g.*, LONDON 2012, TOKYO 2020, etc., and that Defendants, intending to profit from the goodwill and consumer recognition inhering in such names, have registered at least 1,459 domain names incorporating a city name followed by an even-numbered year in four-year intervals corresponding to years in which the Olympic Summer Games will be held.[5] Defendants owned at least 177 such names at the time Plaintiffs filed their complaint in this action.[6] Plaintiffs' complaint contains the following specific allegations:

(1)     Because the process of bidding on and hosting the Olympic Games requires years of planning and coordination, cities that have bid on or hosted the Olympic Games are well-equipped and therefore many re-bid to host other Olympic Games.[7] Capitalizing on this trend, Defendants register domain names comprised of the name of a former bid or host city of the Summer Olympic Games and the year of a future summer Olympic Games.[8] The complaint cites

---

[5]      Complaint, ¶ 29 (Dkt. # 1).

[6]      *E.g.,* tokyo2020.com, rome2024.com, paris2024.com, losangeles2024.com, losangeles2024.org, la2024.com, la2024.org, brisbane2028.com, newdelhi2028.com, capetown2024.com, capetown2024.org, newdelhi2028.org, johannesburg2024.com, johannesburg2024.org, and madrid2028.org.  Complaint ¶ 31.  *See* list of currently infringing domain names, Complaint Exhibit B (Dkt. # 1-2).

[7]      Complaint, ¶ 32.

[8]      *Id.*

examples of Defendants' business model based on prospective summer Olympic Games in Los Angeles;[9] Mexico City;[10] Japan;[11] Rome;[12] and Paris.[13]

(2)     In 2008, the U.S. Olympic Committee (USOC) sought to recover a single domain name from Defendant Frayne, chicago2016.com, by means of a UDRP complaint.[14]  In response, Frayne brought a declaratory action against the USOC in the U.S. District Court for the Northern District of Illinois, alleging that he was entitled to ownership of chicago2016.com because he had acquired it to establish a forum for an "open and honest discussion" about the Olympic Games.[15]

(3)     Frayne's 2008 complaint included counts for reverse domain name hijacking and violation of his federal and state constitutional right to freedom of speech and equal protection.[16]

---

[9]     Los Angeles hosted the Games in 1932 and 1984; Defendants registered la2024.com, la2024.org, la2028.com, la2028.org, la2032.com, la2032.org, la2036.com, la2036.org, la2040.com, la2040.org, losangeles2024.com, losangeles2024.org; losangeles2028.com, losangeles2028.org, losangeles2032.org, losangeles2036.com, losangeles2036.org, losangeles2040.com, and losangeles2040.org.  Complaint, ¶ 32(a).

[10]     In 1968, Mexico hosted the Games in Mexico City; Defendants registered mexicocity2024.org, mexicocity2028.com, mexicocity2028.org, mexicocity2032.com, and mexicocity2036.com.  Complaint, ¶ 32(b).

[11]     In 1964, Japan hosted the Games in Osaka and Tokyo; Defendants registered osaka2024.com, osaka2024.org, osaka2028.com, osaka2028.org, osaka2032.com, osaka2036.com, tokyo2020.com, tokyo2024.com, and tokyo2028.org.  Complaint, ¶ 32(c).

[12]     In 1960, Rome hosted the Games; Defendants registered roma2028.com, roma2028.org, rome2020.com, rome2024.com, and rome2028.org.  Complaint, ¶ 32(d).

[13]     In 1924, Paris hosted the Games; Defendants registered paris2024.com, paris2028.org, paris2032.com, paris2032.org, paris2036.com, and paris2040.org. Complaint, ¶ 32(e).

[14]     Complaint, ¶ 33.  The Uniform Domain Name Dispute Resolution Policy (UDRP) is a set of procedures established by the International Corporation for Assigned Names and Numbers (ICANN).  *See Compana, LLC v. Mondial Assistance, SAS,* No. 3:07-cv-1293, 2008 WL 190552, *1 (N.D. Tex. Jan. 23, 2008) (discussing elements and history of UDRP).

[15]     *See Frayne v. Chicago 2016,* 1:08-cv-05290 (N.D. Ill., filed Sept. 17, 2008, terminated Nov. 10, 2009).

[16]     *See* Complaint for Declaratory and Other Relief, *Frayne v. Chicago 2016,* 1:08-cv-05290 (N.D. Ill.), filed Sept. 17, 2008 (Dkt. # 1).

The USOC brought counterclaims for trademark infringement, violation of the OASA and cybersquatting.[17]  On October 2, 2009, the district court granted the USOC's motion for partial summary judgment, dismissing Frayne's federal and state constitutional claims with prejudice along with his laches defense.[18]  The USOC ultimately dismissed its remaining claims against Frayne without prejudice after he denied under oath that he had any commercial purposes for registering chicago2016.com and agreed to refrain from posting any Olympic-related commercial content at the corresponding website.[19]

(4)     In 2014, when the IOC attempted to acquire tokyo2020.com for use by the Tokyo Organizing Committee in connection with the Tokyo 2020 Olympic Games, its efforts were blocked by Defendants' prior registration of that domain name.[20]  The IOC then discovered a videotaped pitch made by Defendant Frayne to potential investors at a technology forum in Houston, Texas.[21]  In this video, posted online, Frayne announced that he "make[s] money by monetizing the world-wide tremendous interest in the Olympics;" that he purchased almost every domain name following the Olympic City/Year "naming pattern;" that there was "money to be made" online through websites providing housing, tickets, and other services related to the Olympic Games; and that he provided "all those sorts of services."[22]  He claimed to have already

---

[17]     *Id.,* Answer and Counterclaims, Oct. 21, 2008 (Dkt. # 17).

[18]     *Id.,* Memorandum Opinion and Order, Oct. 2, 2009 (Dkt. # 98).

[19]     Complaint, ¶ 34.  *See* Order of Dismissal and for Entry of Judgment, *Frayne v. Chicago 2016* (Dkt. # 102).  *See also* Covenant Not to Sue, appended as Exhibit A to Defendants' motion to dismiss in the present case.  The Covenant Not to Use is limited to the single domain name at issue in *Frayne v. Chicago 2016,* chicago2016.com, and is null and void upon the appearance of any Olympic-related commercial content at www.chicago2016.com.  *Id.*

[20]     Complaint, ¶ 35.

[21]     *Id.*

[22]     *Id.*

raised $455,000 from investors for this scheme, and stated that "[i]n the coming round, [he is] looking to raise $300,000 more."[23]

(5)     None of the 177 disputed domain names currently owned by Defendants links to or hosts  a site that discusses the pros and cons of Olympic bids, and none of the 1,459 disputed names now or historically owned by Defendants have ever resolved to a website with any "discussion," with the exception of spurious content that briefly appeared at www.chicago2016.com after Plaintiff USOC instituted the UDRP complaint that led to the complaint in *Frayne v. Chicago 2016*.[24] Rather, some of the 1,459 disputed domain names historically owned by Defendants have resolved to web pages titled "Future Discussions" with no other content; others have been used for pay-per-click advertising[25]; and some previously resolved to the website of a Chinese company trading as "City Pure," although Defendants have no apparent connection to that company.[26]

## B.     The Court Has Subject Matter Jurisdiction.

Plaintiffs' complaint has five causes of action, four of which assert violations of federal statutes.  As such, the Court has federal question jurisdiction of the first four claims under 28 U.S.C. § 1331, and supplemental jurisdiction over the fifth claim, alleging violation of Tex. Bus. & Com. Code § 16.105, because it is related to the other claims and "form[s] part of the same case or controversy."  28 U.S.C. 1367.  The "undisputed facts" that Defendants allege are that (1) the 2008 Covenant Not to Sue estops Plaintiffs from bringing any claims against Defendants

---

[23]     *Id.*

[24]     Complaint, ¶ 37.  *See generally Web-Adviso v. Trump,* 927 F. Supp. 2d 32 (E.D. N.Y. 2013) (rejecting fair use and constitutional defense based on appearance of spurious content), and discussion *infra.*

[25]     Complaint, ¶ 38.

[26]     Complaint, ¶ 39.

relating to domain names with Olympic cities and years, and (2) Defendants have not made any use of Plaintiffs' alleged Olympic City/Year mark in commerce or trade.  These are factual issues on which Defendants cannot prevail and which they cannot evade by a motion to dismiss for lack of subject matter jurisdiction.  Plaintiffs' complaint sufficiently alleges a basis for the assertion of subject matter jurisdiction.  *See, e.g., Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392 (1987); *Patterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

### 1.   The 2008 Covenant Not to Sue

Defendants argue that the Court lacks subject matter jurisdiction because of a 2008 covenant not to sue.  However, that agreement is limited to chicago2016.com, a single domain name.  *See* Exhibit A to Defendants' memorandum in support of motion to dismiss.  Plaintiffs never waived a cause of action against Defendants for the registration of other infringing domain names.

### 2.   Defendants' Use of Plaintiffs' Marks

The issue, according to Defendants, is "[w]hether Plaintiffs' Complaint is ripe so as to allow this Court to exercise subject matter jurisdiction over Defendants despite the fact Defendants have not made any use of Plaintiffs' alleged Olympic City/Year mark in commerce or trade." *See* Defs.' memorandum at p. 1.  However, use in commerce is not an element of an ACPA violation.[27]  Even if it were, Defendants' assertion conflates "ripeness," a constitutional

---

[27]     *See* discussion *infra*.

principle having no relevance to this case,[28] with personal jurisdiction,[29] coupled with a factual allegation – which Plaintiffs dispute – that Defendants have "not made any use of Plaintiffs' alleged Olympic City/Year mark in commerce or trade."

Defendants argue that Plaintiffs' claims are not "ripe" because Defendants have not used the disputed domain names in commerce, but that if Defendants *did* use the disputed domain names in commerce, then Plaintiffs' claims are barred by laches and acquiescence. *See* Defendants' memorandum at p. 8, n. 38. This argument boils down to an assertion that "it didn't happen, and it was a long time ago." In addition to its internal inconsistency, the argument fails to account for Paragraph 34 of the complaint, which alleges that Plaintiffs settled their claim against Defendant Frayne in 2009 "in reliance on Mr. Frayne's representations that he would use such domain names solely as a forum for discussion, and would not commercialize them." *See* Complaint ¶ 34.

### a.   Monetization of Domain Names is a Use in Commerce.

Even if use in commerce were necessary to an ACPA claim, every court to consider the issue has held that the monetization of domain names incorporating well-known trademarks is a use in commerce.[30] Defendants mistakenly focus on Plaintiffs' citation to Defendant Frayne's

---

[28]      The ripeness doctrine arises in a challenge to unconstitutional government action where a plaintiff fails to allege that a takings claim is ripe for adjudication. "A takings claim is not ripe until (1) the relevant governmental unit has reached a final decision as to how the regulation will be applied ... and (2) the plaintiff has sought compensation for the alleged taking through whatever procedures the state provides." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985); *Severance v. Patterson*, 566 F.3d 490, 496 (5th Cir. 2009).

[29]      Defendants frame the issue as a lack of jurisdiction "over Defendants," not an absence of subject matter jurisdiction over Plaintiffs' claims. *See* Defendants' memorandum at p. 1.

[30]      *See, e.g., Transamerica Corp. v. Moniker Online Servs. LLC*, 672 F. Supp. at 1361-62 (denying motion to dismiss complaint where plaintiff alleged that defendant monetized domain names as keywords for pay-per-click advertising); *accord, Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 130 (2d Cir.2009) ; *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d at 760; *Hearts on Fire Co., LLC v. Blue Nile, Inc.*, 603 F. Supp. 2d at 282; *Hysitron, Inc. v. MTS Sys.Corp.*, No. 07–01533, 2008 WL 3161969 (D. Minn. Aug. 1, 2008).

investor "pitch" to claim that seeking investment capital is not a use in commerce; however, the use in commerce being asserted is the monetization of domain names, not the raising of money from outside investors.[31]

Plaintiffs have alleged that Defendants are using Plaintiffs' trademarks in commerce by monetizing domain names comprising Plaintiffs' marks.  Paragraphs 35 – 39 of the complaint contain the following allegations:

¶ 35:   But in 2014, when Plaintiff IOC attempted to acquire tokyo2020.com for use by the Tokyo Organizing Committee in connection with the tokyo2020 Olympic Games, its efforts were blocked by Defendants' prior registration of that domain name.  The IOC then discovered a videotaped pitch Defendant Frayne made to potential investors at the Rice University's Technology Venture Forum. In this video, posted online, ***Defendant Frayne admitted that he "make[s] money by monetizing the world-wide tremendous interest in the Olympics" and that he purposely purchased almost every domain name following the Olympic City/Year "naming pattern."*** He claimed there was "money to be made" online through websites providing housing, tickets, and other services related to the Olympic Games, and that he provides "all those sorts of services." ***He claimed to have already raised $455,000 from investors for this scheme,*** and noted that "[i]n the coming round, [he is] looking to raise 300,000 dollars more."  *   *   *

¶ 38    Upon information and belief, some of the Defendants' Olympic City/Year domain names resolved to a web page titled "Future Discussions," with no other content.  ***Others hosted pay-per-click ads.***  But today, with the exception of tokyo2020.com (the only selected host city), ***all redirect to Defendant Frayne's new website,*** http://citypure.org/forbidden/, which contains no discussion forum.  tokyo2020.com redirects to citypure.org, which is a web page with the message: "A Balanced Discussion hosted at http://www.tokyo2020.com courtesy of CityPure L.L.C."

¶ 39    Upon information and belief, in the past, Defendants also have ***directed a number of their Olympic City/Year domain names to the website of a Chinese company also trading as "City Pure."***  *   *   *

---

[31]      The cases cited by Defendants to support their claim that they are not using the disputed domain names in commerce are similarly directed to the irrelevant issue of whether "investment solicitation activities" may constitute a use in commerce.  *See* Defendants' memorandum at p. 15, n. 56.  Defendants cite *Cottonwood Fin. Ltd. v. Cash Store Fin. Servs.,* 778 F. Supp. 2d 726, 739 (N.D. Tex. 2011), in which the court found that Canadian company's "investment solicitation activities" in the United States did not constitute a use in commerce and *Leis & Sartash, Inc. v. Davidson,* 955 F. Supp. 2d 821, 825 (N.D. Ill. 2013), where the court held that a defendant's false statements regarding affiliation with plaintiff in conversations with potential investors was not "on or in connection with any goods or services" because neither party had developed any goods or services.

11

Complaint ¶¶ 35, 38, 39 (emphases added).

While the mere registration of domain names may be insufficient to establish a "use in commerce" for purposes of trademark infringement, the same is not true under ACPA; and moreover, the complaint alleges that Defendants have gone far beyond the mere registration of domain names.  Paragraph 35 alone is sufficient to state a claim that Defendants have used the disputed domain names in commerce by advertising and promoting them to investors and raising $455,000 in the process.[32]

In *Euromarket Designs,* the court rejected a motion to dismiss under similar facts, stating:

> Defendant has gone far beyond merely registering a trademark as a domain name. . . ; [Defendant] has actually entered into a sales contract with at least one Illinois customer[.] By anyone's definition of commerce, entering into a sales contract, wherever the goods may be shipped, constitutes use in commerce.

96 F. Supp. 2d at 832.  In the present case, Defendants solicitation of financing from investors for a scheme to profit from Internet domain names incorporating Plaintiff's family of marks constitutes a use in commerce for the same reason that the defendant's execution of a sales contract did in *Euromarket Designs.*

### b.   Defendants' Asserted Noncommercial Use

As grounds for their assertion that they are engaged in a fair use or constitutionally protected speech, Defendants cite their use of a contrived website at www.chicago2016.com in 2008-09 and their current use of a website at www.toyko2020.com, which redirects to http://citipure.org, where no content appears except the following:

---

[32]      *See Maritz , Inc. v. Cybergold, Inc.,* 947 F. Supp. 1328, 1335 (E.D. Mo. 1996) (finding use in commerce although defendant's business was not fully operational, holding that Lanham Act claim can exist before defendant actually opens for business if latter is "imminent and impending"); *accord Euromarket Designs, Inc. v. Crate & Barrell Ltd.,* 96 F. Supp. 2d 824 (N.D. Ill. 2000).

> # A Balanced Discussion
> hosted at http://www.tokyo2020.com courtesy of CityPure L.L.C.

*See* Defendants' memorandum at 5.  Defendants argue:

> There is no allegation of use of the term "Tokyo 2020" on that webpage.  This lawsuit was filed in 2015, perhaps hoping to deter Defendants from utilizing what amounts to several years to implement a fair and/or non-commercial use of <tokyo2020.com>, including, but not limited, to a "discussion forum for the Tokyo 2020 Games" comparable to what Defendants had previously hosted at <chicago2016.com>.

*Id.*

Defendants argue that "Plaintiffs' efforts to divest Defendants of their domain name registrations and anticipatorily censor Defendants' previously exhibited First Amendment free speech usage under the premise of some potential, albeit undefined, commercial use is neither ripe nor sufficient to state a claim upon which relief can be granted."  *Id.* at 12.  However, none of the disputed domain names have been used for any content with the exception of www.chicago2016.com, where content appeared briefly for the apparent purpose of a spurious free speech defense, and www.tokyo2020.com, which displays the words "A Balanced Discussion" as illustrated above.

Defendants' asserted intent to use the disputed domain names for protected speech is a façade.  *See Web-Adviso v. Trump,* 927 F. Supp. 2d 32 (E.D. N.Y. 2013) (rejecting domainer's assertion of fair-use defense and constitutional protection where content at website reflected no substantial investment and was a smokescreen to disguise domainer's commercial purpose in registration of multiple domain names incorporating trademark owner's mark); *Registral.com, LLC v. Fisher Controls Int'l, Inc.,* No. Civ.  A. H-01-1423, 2001 WL 34109376, *4 (S.D. Tex. June 28, 2001) (rejecting domain name registrant's "façade" that domain names were registered

for family genealogical centers that were "coming soon"); *Jews for Jesus v. Brodsky,* 993 F.

Supp. 282, 308 (D. N.J. 1998) (finding that defendant did more than "merely register a domain

name" by creating a "bogus" non-commercial site).

In *Web-Adviso,* the holder of domain names incorporating the name "Trump" followed

by the name of a geographic indication, *e.g.,* trumpmumbai.com, trumpindia.com, brought a

declaratory injunction against the holder of the registered TRUMP trademark seeking a

declaration that he was entitled to use of the domain names.  Like Frayne, the plaintiff in *Web-*

*Adviso* was a "domainer," somebody who "acquire[s] . . . high value domain names and park[s]

them initially with domain parking service providers and/or build[s] the website, if feasible, with

interesting content which takes significant time to program, customize and debug the back-end

codes."[33]

In granting the trademark owner's motion for summary judgment on its ACPA claim, the

district court in *Web-Adviso* rejected the domainer's argument that its use of the disputed domain

names was a fair use and otherwise lawful.  The court found that "the scant news, commentary

and criticism on the websites provide little evidence that Plaintiff registered the Domain Names

in good faith," stating:

> The record reflects that Plaintiff has put in minimal resources in developing the
> websites.  *  *  *   The websites located at the Domain Names, all of which are
> identical, do not contain any material posted after 2011.  *  *  *   The content
> relating to Defendant consists almost entirely of materials taken from third parties,
> such as videos parodying Defendant that he found on YouTube, generic lawyer
> jokes with "lawyer" replaced by "Apprentice," and off-color jokes about alcoholics
> with terms for alcoholics substituted with "Apprentice." *  *  *   The only apparently
> original commentary relating to Defendant is a chart listing ten seasons of
> Defendant's television shows, *The Apprentice* and *The Celebrity Apprentice,*
> containing columns listing the shows' declining ratings and short commentary such
> as "OK season" and "What kind cheap [sic] low budget show is this?"

---

[33]     927 F. Supp. 2d at 36.

927 F. Supp. 2d at 46.[34]

The court in in *Web-Adviso* held that even if the content at the domainer's websites was

the result of a bona-fide attempt to create news and commentary sites, its conduct did not fall

within the ACPA's safe harbor, as the safe harbor was "not intended to create a loophole that

could 'swallow' the Act by allowing a domain name holder to evade liability merely by putting

up a seemingly innocent site under an infringing domain name." 927 F. Supp. 2d at 46 (citing

*Coca-Cola Co. v. Purdy,* 382 F.3d 774, 786-88 (8th Cir. 2004) (enjoining use of domain names

incorporating trademarks from driving Internet traffic to political websites)). As in the present

case, the court in *Web-Adviso* found that:

> [t]he Domain Names themselves do not provide commentary or criticism about
> Defendant or his businesses. They also give no indication that they are addresses
> for websites that are forums for criticizing Defendant, rather than websites operated
> by Defendant.

927 F. Supp. 2d at 46-47.

The court in *Web-Adviso* denied the domainer's First Amendment argument on similar

grounds, finding that "the Domain Names are not communicative and . . . provide no

commentary or criticism of Defendant or any other topic."[35] The court emphasized that it was

"not questioning Plaintiff's First Amendment rights to comment upon and criticize Defendant

---

[34]    The cybersquatting websites in *Web-Adviso* also contained various content unrelated to the
trademark owner under headings apparently lifted from the ACPA's safe harbor provision. 927 F. Supp. 2d at 46.
For example, under a "News" heading, there was a list of real estate headlines automatically generated by a Google
News feed. *Id.* The "Political Commentary" section consisted largely of off-color jokes. *Id.* "In sum," the court stated,
"the websites give the appearance that they were haphazardly put together as an attempt to post minimal content
under each category traditionally associated with fair use (*e.g.*, news, politics, criticism) in an attempt to benefit
from the ACPA's safe harbor." *Id.* The court concluded that "[i]f Plaintiff's conduct were deemed to fall under the
safe harbor simply because he has put up websites with token content ostensibly covered by the fair use doctrine, the
safe harbor exception would swallow the rule." *Id.*

[35]    *Id.* at 47.

and his businesses."[36]  However, the court held, "he may not do so by using [the trademark owner's] mark to confuse people into visiting his websites."[37]  Defendants' fair-use defense and free-speech defenses are spurious in the present case for the same reason they were rejected in *Web-Adviso* and *Registral.com,* namely, they are transparently incorrect and lacking in credibility.

        **c.**    **Plaintiffs' ACPA Claim Does Require Plaintiffs to Allege Use in Commerce.**

Even if Defendants were not making use of Plaintiffs' trademarks in commerce or trade, the ACPA does not require use in commerce. *See, e.g., E. & J. Gallo Winery v. Spider Webs Ltd.*, 129 F. Supp. 2d 1033, 1047–48 (S.D. Tex. 2001), *aff'd*, 286 F.3d 270 (5th Cir. 2002) ("As reflected by the language of the ACPA and the case law interpreting it, there is no requirement ... that the 'use' be a commercial use to run afoul of the ACPA").[38]  As Defendants note in their memorandum, the ACPA requires that a defendant merely "registers, traffics in, or uses a domain name." Defs.' memorandum at p. 16; 15 U.S.C. § 1125(d).   Thus, an allegation that Defendants registered domain names incorporating Plaintiffs protected marks with bad-faith intent to profit is sufficient to state an ACPA violation.  15 U.S.C. § 1125(d).

---

[36]    *Id.*

[37]    *Id.*

[38]    *See also Bosley Med. Inst., Inc. v. Kremer,* 403 F.3d 672, 681 (9th Cir. 2005) ("The district court erred in applying the commercial use requirement to [plaintiff's] ACPA claim.  Rather, the court should confine its inquiry to the elements of the ACPA claim listed in the statute, particularly to whether [defendant] had a bad faith intent to profit from his use of [plaintiff's] mark in his site's domain name"); *accord Lucas Nursery and Landscaping, Inc. v. Grosse,* 359 F.3d 806, 809 (6th Cir. 2004) ("[T]he statute directs a reviewing court to consider only a defendant's 'bad faith intent to profit' from the use of a mark held by another party"); *Wilens v. Doe Defendant No. 1,* 3:14-cv-02419-LB, 2015 WL 4606238, *13 (N.D. Cal. July 31, 2015).

### C.   The Complaint States a Claim Under the ACPA.

To make a showing under the ACPA, a plaintiff must establish "(1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit." *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004).

Defendants argue that Plaintiffs have not met their burden in alleging the first two elements.  The ACPA requires that the disputed domain name be "identical or confusingly similar" to a mark that was "distinctive at the time of registration of the domain name," that the domain name comprise "a trademark, word, or name protected by reason of section 706 of title 18 or section 220506 of title 36," or be "identical or confusingly similar to or dilutive of" a famous mark that was famous at the time of the domain name registration.  15 U.S.C. § 1125(d)(1)(ii).  This means Plaintiffs must allege that they possess distinctive marks and that the disputed domain names fit into one of the above categories.  Plaintiffs have properly alleged a protectable interest in a family of distinctive Olympic City/Year trademarks and that these marks are covered by 36 U.S.C. § 220506(c).

### 1.   The Complaint Sufficiently Alleges that Plaintiffs Possessed a Protectable Family of Marks at the Time of Defendants' 2002 Domain Name Registration.

Defendants argue that the ACPA claim must be dismissed because Plaintiffs have alleged a 2012 trademark registration whereas Defendants first registered one of the disputed domain names as early as 2002.[39]  However, Plaintiffs' claim to a protectable interest in a family of Olympic City/Year trademarks is based not on their 2012 registration but on extensive,

---

[39]   *See* Defs.' memorandum at p. 18-21.

continuous and exclusive use of such marks since 1896. *See Alpha Kappa Alpha Sorority Inc. v. Converse Inc.,* 175 Fed. Appx. 672, 80 U.S.P.Q.2d 1448 (5th Cir. 2006).[40]

In *Alpha Kappa, id.,* the Fifth Circuit held that the plaintiffs properly alleged a protectable trademark interest in trademarks consisting of the founding year of fraternities and sororities and color combinations associated with them. The Court of Appeals held that the following allegations in the complaint were sufficient to withstand a motion to dismiss:

¶ 24:   The founding years and organizational colors that the Plaintiffs have adopted are unique to Plaintiffs' identification and accomplishments and have acquired significant meaning to the members of Plaintiffs' organizations as well as secondary meaning to the general public. * * *

¶ 27:   Since at least as early as 1908, Plaintiffs have also used their marks and trade dress worldwide in connection with the manufacture, sale and licensing of Greek paraphernalia, including apparel, shoe wear, and other products.

¶ 28:   Continually, since long prior to the acts complained of herein, Plaintiffs have generated substantial revenues from manufacturing, selling, and licensing for manufacture and sale of, Greek paraphernalia, including apparel, shoe wear, and other products that contain Plaintiffs' marks and trade dress.

¶ 29:   The Plaintiffs' marks and trade dress are arbitrary, suggestive and inherently distinctive.

¶ 30:   As a result of Plaintiffs' efforts to promote their organizations, trade dress and marks, these marks have acquired in the minds of the public a secondary meaning, and have become distinctive marks denoting identification with and sponsorship from, the Plaintiffs' organizations.

¶ 31:   As a further result of Plaintiffs' efforts, the marks are recognized as being associated exclusively with the services and products marketed or licensed by Plaintiffs or their authorized representatives.

175 Fed. Appx. at 677.

---

[40]      The validity of Plaintiffs' claim to exclusive rights in Olympic City/Year designations has been consistently recognized in multiple UDRP decisions, *e.g., Int'l Olympic Comm. v. The Vu Dao/Home,* FA 1589324 (Nat. Arb. Forum Dec. 24, 2014) (lillehammer2016.com); *Beijing Organizing Comm. v. GBS Data Sys.,* FA 479544 (Nat. Arb. Forum June 28, 2005) (bejing2008.org); *Beijing Organizing Comm. v. OpenBusiness Ltd.,* FA 1181252 (Nat. Arb. Forum June 13, 2008) (pekin2008.com); *Athens 2004 Organizing Comm. v. Molloy,* FA 260584 (Nat. Arb. Forum June 11, 20014) (athens2004.org).

The allegations held sufficient to state a claim in *Alpha Kappa* are materially similar to the following allegations in Plaintiffs' complaint in the present case:

¶ 17:   The Olympic Games are organized following the distinctive Olympic format of staggered Summer and Winter Games, each held in even-numbered, four-year intervals.  Beginning in 1896, the Summer and Winter Olympic Games took place every four years, in the same even-numbered year. Starting in 1992, the Summer and Winter Olympic Games were staggered, so that an event occurred every two years. Following this staggered pattern, the Summer Olympic Games continue to be held four years apart on even numbered years, as are the Winter Olympic Games.

¶ 18:   Reflecting this long-standing tradition in the Olympic Movement, the IOC has—for over one hundred years—used names combining the city name and the even-numbered year of the event as trademarks to designate and differentiate each Olympic Games.  Such names include ATHENS 1896, BARCELONA 1992, SYDNEY 2000, TURIN 2006, BEIJING 2008, VANCOUVER 2010, LONDON 2012, and TOKYO 2020. For example, medals awarded during the 1896 Olympics in Athens, Greece were emblazoned with the ATHENS 1896 mark (in Greek). Posters from the 1912 Olympic Games in Stockholm, Sweden contained the STOCKHOLM 1912 mark.

¶ 19:   As a result of the Olympic Plaintiffs' consistent use and registration of Olympic City/Year names as trademarks, and their extensive investment in developing the goodwill associated with the Olympic Games, these names—and the Olympic City/Year naming pattern itself—are widely recognized by the public as identifiers of the IOC, the National Olympic Committees, and the Olympic Movement.

¶ 20:   The IOC, the National Olympic Committees, including Plaintiff USOC, Organizing Committees for the Olympic Games, and host cities consistently take measures to protect the Olympic City/Year names associated with the Olympic Games. For example, the IOC and the USOC have obtained federal trademark registrations for numerous Olympic City/Year names for prior Olympic Games, including BEIJING 2008, VANCOUVER 2010, LONDON 2012, and TOKYO 2020. Illustrative examples of Olympic City/Year names the IOC or the USOC have in the past registered as trademarks are attached as Exhibit A.

¶ 21:   The goodwill associated with Olympic Plaintiffs' Olympic City/Year names is a valuable asset vital to ensure their long-term ability to help fund the Olympic Movement.  The IOC and USOC receive no government funding; their revenues are derived primarily from the sale of television rights for broadcasting the Olympic Games and from marketing, licensing, and sponsorship programs related to use of the Olympic intellectual property rights.

19

¶ 22:   The IOC's licensed broadcasts of the Olympic Games on television reach a global audience that few broadcasts, if any, can match. For example, the LONDON 2012 SUMMER GAMES were broadcast to an estimated 3.6 billion viewers in 220 nations and territories. These viewing numbers underscore the fact that the Olympic City/Year names are some of the most well-known in the world.

¶ 23:   The IOC also extensively uses and/or licenses others to use its Olympic City/Year names in global marketing programs. These marketing programs include worldwide sponsorship agreements with Olympic partners such as Coca-Cola, Samsung, and Visa, as well as local partners. As a result of these sponsorship and license agreements, the IOC's worldwide sponsors contribute hundreds of millions of dollars to help fund each Olympic Games. In turn, the IOC distributes over 90% of its revenues to organizations throughout the Olympic Movement to support the staging of the Olympic Games and to promote the worldwide development of sport.

¶ 24:   Many nations, including the United States, the United Kingdom, Australia, Greece, Canada, China, and Russia, have passed national legislation to protect the intellectual property of the IOC and its National and city Organizing Committees, as mandated in the Olympic Charter. In the United States, the OASA not only grants the USOC exclusive use of select Olympic names and symbols, but also bars unauthorized parties from making commercial use of "any trademark, trade name, sign, symbol, or insignia falsely representing association with, or authorization by, the International Olympic Committee...." 36 U.S.C. § 220506(c)(4).

¶ 25:   Similarly, the laws of the State of Texas also prohibit the use of a trademark, trade name, sign, symbol, or insignia falsely representing association with or authorization by the IOC or the USOC for the purpose of trade or to induce the sale of goods or services. Tex. Bus. & Com. Code § 16.105 on OLYMPIC SYMBOLS.

¶ 26:   The IOC and the National Olympic Committees continuously defend against unauthorized use of Olympic City/Year names in Internet domain names. For example, in an in rem lawsuit filed in 2000 under the Anticybersquatting Consumer Protection Act, the IOC, joined by the USOC and the Salt Lake Organizing Committee, successfully brought suit to cancel or recover nearly 1,800 Internet domain names that were making unauthorized use of the OLYMPIC marks, including ATHENS 2004 and BEIJING 2008. *U.S. Olympic Comm., Int'l Olympic Comm., and Salt Lake Org. Comm. for the Olympic Winter Games of 2002 v. 2000olympic.com, et al.*, 1:00-CV-01018-CMH (E.D. Va., filed June 20, 2000).

¶ 27:   Similarly, the IOC and the National Olympic Committees have successfully protected the Olympic City/Year names—including TURIN 2006, BEIJING 2008, VANCOUVER 2010, NANJING 2014, and LILLEHAMMER 2016—in

Uniform Domain Name Dispute Resolution Policy ("UDRP") proceedings. These UDRP panels have recognized the special circumstances that give the IOC prior rights in Olympic City/Year domain names, based in part on the OASA protections, as well as comparable protections in other countries, and that the IOC has owned rights in such marks associated with the Olympic Games for over 100 years.

¶ 28:   By virtue of the aforementioned extensive use, recognition, and protection for over 100 years, Olympic Plaintiffs' Olympic City/Year names—and the naming pattern itself—are distinctive, famous, world-renowned, and entitled to broad protection under national laws throughout the world, including in the United States and the State of Texas.

Compl. ¶¶ 17-28.

Under *Alpha Kappa,* Plaintiffs' allegations are sufficient to state a claim that Plaintiffs had a protectable interest in a family of City/Year marks as of 2002. *See also Canales v. ALM Media, LLC,* 12-cv-1036, 2013 WL 5719476 (W.D. Tex. Oct. 18, 2013) (recommending denial of motion to dismiss where complaint alleged prior and enforceable rights in disputed trademark and consequent likelihood of confusion); *accord Tempur-Pedic Int'l. Inc. v. Angel Beds LLC,* 902 F. Supp. 2d 958 (S.D. Tex. 2012); *John Crane Prod. Solutions, Inc. v. R2R and D, LLC,* 3:11-cv-3237, 2012 WL 1571080 (N.D. Tex. May 4, 2012).

### 2.   Plaintiffs' ACPA Claim Does Not Require a Finding That Defendants' Domain Name Registrations Incorporate A Mark Protected By 36 U.S.C. § 220506.

Defendants additionally argue that Plaintiffs' ACPA claim should be dismissed for failure to allege a protectable mark under the OASA, 36 U.S.C. § 220506, or the analogous Texas statute, Texas Business & Commercial Code § 16.105.[41] Defendants cite no supporting cases for their argument that "[t]he Olympic City/Year combination is not protected." *See*

---

[41]   Defs.' memorandum at p. 22-23.

Defendants' memorandum at p. 9.  Contrary to Defendants' argument, 36 U.S.C. § 220506

provides in relevant part:

> (c)    Civil action for unauthorized use. * * * [The IOC] . . . may file a civil action against a person [trademark infringement] if the person, without the consent of the corporation, uses for the purpose of trade, [or] to induce the sale of any goods or services . . .
>
>         *                   *                     *
>
> (4)    *any* trademark, trade name, sign, symbol, or insignia falsely representing association with, or authorization by, the International Olympic Committee . . .

36 U.S. § 220506(c) (emphasis added).  *See generally San Francisco Arts & Athletics, Inc. v.*

*U.S. Olympic Comm.,* 483 U.S. 522 (1997) (holding that OASA does not require proof of

confusing similarity).  Contrary to Defendants' argument, Plaintiffs' allegations under the OASA

and its Texas analogue state a cause of action for the same reasons that the court held were

sufficient in *Alpha Kappa,* namely, ownership in a family of marks based on extensive,

continuous and exclusive use, and unauthorized use of those marks for a use in commerce that is

likely to cause confusion, mistake or deception.

### D.    Defendants' Additional "Facts" Do Not Support Dismissal of the Complaint.

Defendants' memorandum includes several "fact" allegations that do not directly touch

on the alleged issues with Plaintiffs' complaint even assuming they are properly raised in support

of a motion to dismiss.

### 1.    Defendants' Use of the Tokyo2020.com Domain Name

According to Defendants, Plaintiffs "concede" that the tokyo2020.com domain name

redirects to a landing page and have failed to allege that there is use of "Tokyo 2020" on that

webpage.[42]  It is unclear how these "facts" would support Defendants' claims that the Court

---

[42]    Defs' memorandum at p. 5-6.

lacks subject matter jurisdiction or that Plaintiffs' ACPA claim fails as a matter of law.  As noted *supra*, whether Defendants are using Plaintiffs' TOKYO 2020 mark in commerce or trade is a factual issue not properly raised in support of a motion to dismiss.  *See Full Sail, Inc. v. Dauben, Inc.*, Civil Action No. 3:08-CV-0446-G, 2008 WL 2434313, at *3-4, n. 3 (N.D. Tex. June 17, 2008) (noting that factual determinations regarding "use in commerce" and "likelihood of confusion" are inappropriate at the motion to dismiss stage).

### 2.      No Attempts to Sell Disputed Domain Names to Plaintiffs

Defendants claim that there is "no factual allegation in the current lawsuit that Defendants ever attempted to sell or plan to sell <Tokyo2020.com> or any of the other domain names to Plaintiffs or another third party."  *See* Defs.' memorandum at 6.  This "fact" does not remove the Court's jurisdiction over this dispute or mean that Defendants cannot be liable for a violation of the ACPA.  *See Texas Int'l Property Ass'n v. Hoerbiger Holding AG*, 624 F. Supp. 2d 582, 590 (N.D. Tex. 2009) (holding that domain holder had bad faith intent to profit, even though he "refused to sell the . . . domain name and ha[d] never made an offer to sell the name" because, among other things, he "was using the name for another source of monetary gain").

### 3.      Defendants' Use of Disputed Domain Names

Defendants claim that they are not using the disputed domain names in a manner that is likely to cause confusion as to source.  According to Defendants, Plaintiffs "concede" that non-commercial use of an Olympic City/Year domain name is legitimate.  However, Plaintiffs' complaint alleges with particularity the manner in which the disputed domain names have been used.[43]

---

[43]      Complaint ¶¶ 38-39.

In addition, Defendants cite Paragraph 40 of Plaintiffs' complaint for the correct but inapplicable proposition that "a discussion forum about the Olympic Games" could be a legitimate use of a domain name.  Contrary to Defendants' point, it does not follow that all of the 1,459 disputed domain names have been used for a "non-commercial purpose" or that Plaintiffs' claims should be dismissed because Defendants are not using the disputed domain names in a commercial manner.  Moreover, Defendants overlook Plaintiffs' allegation that "[u]pon information and belief, many of Defendants' Olympic City/Year domain names have been acquired by other cybersquatters, without ever having been used for any legitimate purpose . . . ." Compl., ¶ 40.

## V.    Conclusion

This case is a classic and egregious case of cybersquatting and trademark infringement, and Plaintiffs' complaint pleads all of the requisite elements with particularity.  The 2008 agreement asserted by Defendants is expressly limited to a single domain name, and Plaintiffs' allegations about Defendants' subsequent monetization of domain names incorporating Plaintiffs' family of trademarks are more than sufficient to sustain the complaint.  For these reasons, and all the reasons discussed above, Defendants' motion to dismiss is frivolous and should be denied.

Respectfully submitted,

Dated: March 15, 2016

James L. Bikoff
Admitted *pro hac vice*
District of Columbia Bar No. 293753
**Smith, Gambrell & Russell, LLP**
1055 Thomas Jefferson St., N.W., Suite 400
Washington, D.C. 20007
Telephone: (202) 263-4300
Fax: (202) 263-4329

ATTORNEY-IN-CHARGE FOR PLAINTIFFS

Of Counsel:
Bruce A. McDonald
Admitted *pro hac vice*
District of Columbia Bar No. 293753
Holly B. Lance
Admitted *pro hac vice*
District of Columbia Bar No. 988867
**Smith, Gambrell & Russell, LLP**
1055 Thomas Jefferson St., N.W., Suite 400
Washington, D.C. 20007
Telephone: (202) 263-4300
Facsimile: (202) 263-4329

Rodney Caldwell
Texas Bar No. 03632000
Federal Bar No. 00879
Jered E. Matthysse
Texas Bar No. 24072226
Federal Bar No. 1115779
**Pirkey Barber PLLC**
600 Congress Avenue, Suite 2120
Austin, TX 78701
Telephone: (512) 322-5200
Fax: (512) 322-5201

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 15, 2016, a copy of the foregoing Plaintiffs' Opposition to Defendants' Motion to Dismiss was filed using the CM/ECF filing systems which electronically forwarded a copy on the following counsel of record:

Karl Seelbach, Esq.
Trek Doyle, Esq.
Doyle & Seelbach PLLC
7500 Rialto Blvd.
Bldg. 1, Suite 250
Austin, Texas 78735

Brian A. Hall, Esq.
Traverse Legal, PLC d/b/a Hall Law
600 Congress Ave., 14th Floor
Austin, Texas 78701


Jered E. Matthysse